NB:SCF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x **MJ-12-213**

UNITED STATES OF AMERICA

   - against -

THE PREMISES KNOWN AND DESCRIBED AS
865 MERRICK ROAD, SUITE 300,
BALDWIN, NEW YORK, 11510

- - - - - - - - - - - - - - - -X

SEALED AFFIDAVIT IN
SUPPORT OF SEARCH
WARRANT

(T. 21, U.S.C., §§ 846,
841(a)(1), 841(b)(1)(C),
and 812; T. 18,
U.S.C., § 2)

EASTERN DISTRICT OF NEW YORK, SS:

     JOSEPH D. HILL, being duly sworn, deposes and states as follows:

## INTRODUCTION

     1.   I am a Detective with the Nassau County Police Department, currently assigned as a federal Task Force Officer with the Drug Enforcement Administration's Long Island District Office.  As a Detective and Task Force Officer I have conducted investigations of narcotics offenses and health care fraud matters, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, and the methods by which

individuals conceal and secure the proceeds of such drug
activity.

2. I submit this Affidavit in support of the
Government's application for a search warrant to enter and search
THE PREMISES KNOWN AND DESCRIBED AS 865 MERRICK ROAD, SUITE 300,
BALDWIN, NEW YORK 11510 (the "SUBJECT PREMISES") and to seize the
items set forth below and in ATTACHMENT A, all of which
constitute evidence, fruits and/or instrumentalities of
violations of Title 21, United States Code, Section 846.

3. Upon information and belief, in or about and
between January 2009 and February 2012, both dates being
approximate and inclusive, within the Eastern District of New
York, William J. Conway, together with others, did knowingly and
intentionally conspire to distribute and dispense and possess
with intent to distribute and dispense controlled substances,
which offense involved Oxycodone, commonly known as "OxyContin,"
contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and
841(b)(1)(C), Title 18, United States Code, Sections 3551 et
seq.)

4. The facts contained in this Affidavit are based in
part upon personal knowledge, and in part upon information
learned from other sources, such as other law enforcement
personnel, confidential sources, eyewitnesses, surveillance,

-2-

audio and video recordings, physical evidence and other documents recovered and gathered during the course of the investigation, as well as on my experience and background as a Detective and Task Force Officer.  Where conversations, statements and the actions of others are related herein, they are related in substance and in part, unless otherwise indicated.  Because this Affidavit is submitted for the limited purpose of establishing probable cause to search the SUBJECT PREMISES, I have not set forth every fact that I have learned over the course of this investigation.

5 .  Based on my training and experience, including the investigation of diversion of legitimately manufactured pharmaceuticals to unauthorized individuals, I am familiar with various types of legitimate controlled substances in Schedule II of 21 U.S.C. § 812 that are often distributed illegally.  As relevant to this case, Oxycodone, a Schedule II controlled substance, which is commonly known as "OxyContin," is a semi-synthetic opiod analgesic that is similar to codeine and is used to treat moderate to severe pain, but can result in addiction similar to morphine.  There is an illegal market for Oxycodone as a substitute for, or adjunct to, other illegal narcotics.

### DESCRIPTION OF THE PREMISES

6.  During the course of this investigation, I have observed the SUBJECT PREMISES, including the surrounding area.  I have also spoken with other witnesses and law enforcement

-3-

officers who have entered the SUBJECT PREMISES in an undercover capacity. The building housing the SUBJECT PREMISES is a two-story, white structure, located at 865 Merrick Road in Baldwin, New York. On both the north and south sides of the building the name "Baldwin Medical Plaza" and "865" appear on the structure. The SUBJECT PREMISES encompasses Suite 300 of the building. Suite 300 is an office space located on the building's second floor. The reception area of the SUBJECT PREMISES measures approximately 25 feet wide, by 25 feet deep, and contains a "front desk" area measuring approximately 12 feet by 8 feet. The SUBJECT PREMISES also contains multiple examination rooms of unknown dimensions. Scattered throughout the SUBJECT PREMISES are desks, chairs, file cabinets, storage rooms or closets, and a bathroom. The office contains both laptop and desktop computers. Photographs depicting the outside of the building housing the SUBJECT PREMISES are attached hereto as Exhibits A and B, respectively.

<u>PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES</u>

7. William J. Conway (hereinafter "Conway") is a medical professional, licensed by the State of New York and specializing in the area of Internal Medicine. Since in or about January 2012, Conway has been under investigation for suspected narcotics trafficking. Specifically, the government's investigation to date indicates that Conway is distributing and

-4-

dispensing, and conspiring to distribute and dispense narcotics, including Oxycodone, outside the scope of professional medical practice and not for a legitimate medical purpose from the SUBJECT PREMISES.

8.   In January 2012, law enforcement received information from a male Confidential Source (hereinafter "CS-1") indicating that Conway is using his medical office located at the SUBJECT PREMISES to distribute prescriptions for Oxycodone and other narcotics to various "patients" after performing little or no medical evaluation on those individuals.[1]  According to CS-1, Conway often sells these prescriptions of Oxycodone and other narcotics for varying amounts of cash.

9.   According to CS-1, he became a new patient of Conway's in approximately April 2011.  According to CS-1, he received Conway's name and telephone number from a friend, "John Doe 1," who is also a patient of Conway's, and who is also prescribed Oxycodone by Conway on a regular and continuing basis. According to CS-1, during his first appointment with Conway at the SUBJECT PREMISES in April 2011, he provided Conway with a MRI report, dated in 2009, showing 2 herniated discs in CS-1's spine. At this first appointment, CS-1 told Conway that he was routinely

---

[1]    Much of the information provided to law enforcement by the CS-1 in the course of this investigation has been corroborated by independent and additional evidence. Accordingly, I deem CS-1 to be reliable.

taking eight 30-milligram Oxycodone pills each day for pain.   In
reality, CS-1 was taking fifteen to twenty 30-milligram Oxycodone
pills each day by crushing them into a powder and snorting them.
CS-1 indicated that during this first visit to the SUBJECT
PREMISES, Conway performed no medical evaluation on him other
than taking his pulse and blood pressure, and asked CS-1 no
questions concerning his medical background or history.
Thereafter, CS-1 paid Conway $40.00 in cash, and Conway provided
CS-1 with a prescription for 180 tablets of 30-milligram
Oxycodone.

          10.   According to CS-1, he has returned to the SUBJECT
PREMISES on multiple occasions since April 2011 to obtain
additional prescriptions for Oxycodone from Conway.[2]  On many of
these visits, CS-1 has sought additional Oxycodone from Conway
prior to the time when his previously filled prescription should
have been completed, if taken in the proper amount and dosage.
In each of these instances, Conway has commented to CS-1 that he
was seeking his refill of Oxycodone "early," but nonetheless
provided CS-1 with the additional prescription.   Conway has never
conducted any medical examination of CS-1 during any of these
subsequent visits.   Often times, CS-1 has not even seen Conway at
the SUBJECT PREMISES, but rather picks up a prescription, signed

_____

          [2]     According to CS-1, since April 2011, Conway has also
routinely prescribed him with the additional narcotics Alprazolam
(Xanax) and Fentanyl.

-6-

by Conway, from an office assistant.

11. On Saturday, January 28, 2012, Conway contacted CS-1 and requested that CS-1 meet him at the SUBJECT PREMISES. Thereafter, law enforcement provided CS-1 with an audio recording device prior to CS-1 entering the SUBJECT PREMISES. At approximately 3:00 p.m. on January 28, 2012, CS-1 had a face-to-face meeting with Conway in the SUBJECT PREMISES. CS-1 captured the entirety of his conversation with Conway on the recording device he was provided.

12. During their conversation, Conway told CS-1, in sum and substance, that he had recently received a letter concerning CS-1 and that there could be increased scrutiny on Conway because of his prescribing Oxycodone to CS-1. Therefore, Conway wanted to review and presumably alter CS-1's treatment records to ensure "all the [treatment] dates fit."[3] As the

---

[3] During the course of this investigation I have learned that the New York State Office of Professional Medical Conduct ("OPMC") has instituted an investigation of Conway vis-a-vis his treatment of CS-1. The OPMC investigation commenced after CS-1's mother called to complain about Conway and his prescribing of Oxycodone to her son.

In addition, during the course of this investigation I have learned that within the past 10 months two of Conway's regular "patients" have died of Oxycodone overdoses. John Doe 2 received seven prescriptions for Oxycodone, totaling 1,260 tablets from Conway between April 2011 and October 25, 2011. On October 27, 2011, John Doe 2 was pronounced dead of an overdose. The Medical Examiner's report is currently pending, however, I have spoken to the Medical Examiner's office and was given a preliminary cause of death of an overdose of Oxycodone and other narcotics.

-7-

conversation continued, Conway discussed with CS-1 how CS-1 had a history of alcohol problems, and how CS-1 had previously served time in prison.[4]   Finally, Conway informed CS-1 that he wasn't sure what "they" will do, and that "they" might ask CS-1 about Conway's treatment of him.

13.   Thereafter, on or about February 6, 2012, CS-1 traveled to the SUBJECT PREMISES in order to purchase a prescription for Oxycodone from Conway.   CS-1 was wearing an audio and video recording device during this visit.   After entering the SUBJECT PREMISES on February 6, 2012, CS-1 met with Conway's front desk assistant, and asked for a prescription for Oxycodone.   The assistant proceeded to search the SUBJECT PREMISES for several minutes for CS-1's medical file before issuing CS-1 a prescription for 180 tablets of 30-milligram Oxycodone.   It appears from the video recording that the prescription was pre-signed by Conway.   No medical examination of CS-1 was conducted on February 6, 2012 by Conway or anyone else at the SUBJECT PREMISES.

---

Additionally, John Doe 3 received five prescriptions for Oxycodone, totaling 900 tablets from Conway between February 2011 and April 22, 2011.   On April 23, 2011, John Doe 3 was pronounced dead of an overdose.   The Medical Examiner's report lists the cause of death as an overdose of Oxycodone and other narcotics.

[4]   CS-1 was incarcerated in the Nassau County Correctional Center from June 6, 2011 to December 21, 2011, after being arrested for selling Oxycodone pills.

14. Additionally, I have reviewed certain records obtained during the course of this investigation from the Bureau of Narcotics Enforcement ("BNE"). According to those records, between January 2009 and November 2011, Conway has written and distributed approximately 5,554 prescriptions for Oxycodone (for a total pill amount of 782,032). That amount equates to approximately 163 prescriptions for Oxycodone written by Conway each month during that period. Approximately 926 of these prescriptions for Oxycodone were written by Conway to patients with dates of birth in or after 1980.

## ITEMS LIKELY TO BE FOUND AT THE SUBJECT PREMISES

15. Based on the foregoing, my involvement in this investigation, and my training and experience, it is my belief that there is probable cause that the SUBJECT PREMISES have been and are continuing to be used to store instrumentalities, evidence and fruits of violations of Title 21, United States Code, Section 846, including, but not limited to, the following items also listed in ATTACHMENT A:

a. any and all documents evidencing agreements with medical professional service providers, including other medical physicians, pharmacies, drug companies, and insurance companies;

b. Calendars, appointment books, daily logs, co-payment signature sheets, patient sign-in sheets, and telephone

-9-

logs, which might demonstrate when patients visited or contacted the doctor for prescription medications between January 2009 and the present;

c.   Explanations of Medical Benefit ("EOMB") forms showing which patients' claims are being reimbursed;

d.   Any and all documents evidencing correspondence or communications with insurance providers and patients, including, but not limited to, provider applications, refund requests, and documents evidencing billing practices;

e.   Documents evidencing records of patient visits, dates of service, procedures performed, and billed amounts between January 2009 and the present;

f.   Insurance provider newsletters containing educational materials concerning proper billing practices and appropriate procedures for distributing controlled substances;

g.   Any written billing instructions, including but not limited to, what CPT code to bill or what diagnosis to use;

h.   Copies of any forms used to indicate what services should be billed for a patient's visit;

i.   Items indicating where the proceeds of the scheme are held or how the proceeds have been used, including, but not limited to, bank account information, and financial records, whether maintained in hard copy or computerized, to

include general ledger, general journals, gross receipts and
income records, cash receipts and disbursement records and/or
journals, sales and purchase records, accounts receivables and
payable ledgers, voucher register and all sales and expense
invoices including all invoices documenting expenses paid by
cash, bank check, and retained copies of any bank checks;

        j.    All financial statements, bookkeeper's and/or
accountant's workpapers used in preparation of corporate records
or tax returns.  Retained copies of all federal and state income,
payroll and excise tax returns, both personal and corporate;

        l.    Prescriptions, patient drug profiles,
prescription log books, records of prescription fills and
refills, and Medicaid billing records between January 2009 and
the present;

        m.    Address and/or telephone books, rolodex
indices and any papers reflecting names, addresses, telephone
numbers, pager numbers, fax numbers and/or telex numbers of co-
conspirators, sources of supply, customers, financial
institutions, and other individuals or businesses with whom a
financial relationship exists;

        n.    Any and all controlled substances including,
but not limited to, diverted pharmaceuticals including Oxycodone,
OxyContin, and traces thereof; equipment used to package
controlled substances, as well as books, records, receipts,

-11-

notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

o.      United States or foreign currency, or other valuables which represent the proceeds of criminal activity;

p.      Patient records and files for the individuals identified by their initials in the chart below.[5]  The chart consists of names retrieved from a Bureau of Narcotics report and reflects a subset of the defendant's patients who received Schedule II narcotics on a consistent basis since January 1, 2009.  From my training and experience, the records and files of such patients would not and do not contain medical information commonly found in files of patients that were being dispensed Schedule II narcotics for a legitimate medical purpose.[6]

**FIRST INITIAL      LAST INITIAL**

| FIRST INITIAL | LAST INITIAL |
|---------------|--------------|
| A | A |
| A | A |
| N | B |
| K | B |
| C | B |
| M | B |
| J | B |
| D | B |
| M | B |
| L | B |
| K | C |

---

[5]      I am aware of the full names of all the individuals identified by their initials in the chart below, and in the chart contained in ATTACHMENT A to this Affidavit.

[6]      To the extent that patients require medical records or files that are seized, law enforcement will make copies of such records available upon request of the individual patient.

| | |
|---|---|
| F | C |
| K | C |
| K | C |
| T | C |
| B | C |
| J | D |
| N | D |
| J | D |
| B | D |
| A | D |
| N | D |
| C | F |
| M | G |
| D | G |
| N | G |
| K | G |
| N | H |
| J | K |
| N | K |
| J | L |
| E | L |
| C | L |
| J | M |
| A | M |
| M | M |
| A | M |
| R | M |
| E | P |
| J | P |
| L | P |
| M | P |
| R | R |
| C | S |
| M | S |
| I | S |
| J | S |
| D | S |
| J | S |
| C | S |
| S | T |
| G | T |
| S | W |
| C | W |
| R | Y |
| J | Z |
| C | Z |

16.   Based on my training, experience, participation in other investigations concerning narcotics trafficking, and discussions with other law enforcement agents, I know that individuals who illegally distribute and dispense narcotics routinely secret and store items of the sort described in ATTACHMENT A in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.   This warrant and this search procedure specifically include the search of any closed containers or cabinets, locked or unlocked, found within the SUBJECT PREMISES.

### CONCLUSION

WHEREFORE, I respectfully request that a search warrant be issued allowing agents to enter and search the SUBJECT PREMISES and to seize the items set forth in ATTACHMENT A to this Affidavit, all of which constitute evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Section 846.   Due to the nature of this application, I further request that this application and its accompanying warrant be sealed.

WHEREFORE, your deponent respectfully requests that the search warrant be issued as applied for herein.

_Joseph D. Hill_
Joseph D. Hill
Detective, Nassau Cty. Police Dept.
Task Force Officer

Sworn to before me this
29th day of February, 2012

HON. A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

Evidence, instrumentalities and fruits of violations of Title 21, United States Code, Section 846, to be seized from the premises known and described as 865 MERRICK ROAD, SUITE 300, BALDWIN, NEW YORK 11510, and any locked or closed containers therein:

a. any and all documents evidencing agreements with medical professional service providers, including other medical physicians, pharmacies, drug companies, and insurance companies;

b. Calendars, appointment books, daily logs, co-payment signature sheets, patient sign-in sheets, and telephone logs, which might demonstrate when patients visited or contacted the doctor for prescription medications between January 2009 and the present;

c. Explanations of Medical Benefit ("EOMB") forms showing which patients' claims are being reimbursed;

d. Any and all documents evidencing correspondence or communications with insurance providers and patients, including, but not limited to, provider applications, refund requests, and documents evidencing billing practices;

e. Documents evidencing records of patient visits, dates of service, procedures performed, and billed amounts between January 2009 and the present;

-16-

   f. Insurance provider newsletters containing educational materials concerning proper billing practices and appropriate procedures for distributing controlled substances;

   g. Any written billing instructions, including but not limited to, what CPT code to bill or what diagnosis to use;

   h. Copies of any forms used to indicate what services should be billed for a patient's visit;

   I. Items indicating where the proceeds of the scheme are held or how the proceeds have been used, including, but not limited to, bank account information, and financial records, whether maintained in hard copy or computerized, to include general ledger, general journals, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records, accounts receivables and payable ledgers, voucher register and all sales and expense invoices including all invoices documenting expenses paid by cash, bank check, and retained copies of any bank checks;

   k. All financial statements, bookkeeper's and/or accountant's workpapers used in preparation of corporate records or tax returns. Retained copies of all federal and state income, payroll and excise tax returns, both personal and corporate; from January 2006 to the present ab

   l. Prescriptions, patient drug profiles, prescription log books, records of prescription fills and

-17-

refills, and Medicaid billing records between January 2009 and the present;

        m.    Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

        o.    Any and all controlled substances including, but not limited to, diverted pharmaceuticals including Oxycodone, OxyContin, and traces thereof; equipment used to package controlled substances, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

        p.    United States or foreign currency, or other valuables which represent the proceeds of criminal activity;

        q.    Patient records and files of the individuals identified by their initials in the chart below.

| FIRST INITIAL | LAST INITIAL |
| --- | --- |
| A | A |
| A | A |
| N | B |
| K | B |
| C | B |
| M | B |
| J | B |
| D | B |
| M | B |
| L | B |

| | |
|---|---|
| K | C |
| F | C |
| K | C |
| K | C |
| T | C |
| B | C |
| J | D |
| N | D |
| J | D |
| B | D |
| A | D |
| N | D |
| C | F |
| M | G |
| D | G |
| N | G |
| K | G |
| N | H |
| J | K |
| N | K |
| J | L |
| E | L |
| C | L |
| J | M |
| A | M |
| M | M |
| A | M |
| R | M |
| E | P |
| J | P |
| L | P |
| M | P |
| R | R |
| C | S |
| M | S |
| I | S |
| J | S |
| D | S |
| J | S |
| C | S |
| S | T |
| G | T |
| S | W |
| C | W |
| R | Y |
| J | Z |
| C | Z |

# EXHIBIT A

# EXHIBIT B

